IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DITECH FINANCIAL LLC,                           No. 3:15-cv-01214-HZ

        Plaintiff,

  v.

DAVID S. MIKKELSEN; and D. CRAIG                 OPINION & ORDER
MIKKELSEN and LINNELL MIKKELSEN,
husband and wife and the marital
community composed thereof,

        Defendants.

Janis G. White
FIDELITY NATIONAL LAW GROUP
701 - 5th Avenue, Suite 2710
Seattle, Washington 98104

     Attorney for Plaintiff

W. Terry Scannell
7128 S.W. Gonzaga Street, #220
Portland, Oregon 97223

     Attorney for Defendant David S. Mikkelsen

1 - OPINION & ORDER

D. Craig Mikkelsen
Linnell Mikkelsen
P.O. Box 307
Molalla, Oregon 97038

     Defendants Pro se

HERNANDEZ, District Judge:

     Plaintiff Ditech Financial brings this case against various members of the Mikkelsen family seeking to establish relative lien priority rights of deeds of trust securing real property in Clackamas County.  Plaintiff brings a claim of equitable subrogation and alternatively, unjust enrichment, as well as a claim for declaratory relief.  Both Plaintiff and Defendants move for summary judgment.   I deny Defendants' motion and grant Plaintiff's motion.

## BACKGROUND

     Defendants Craig and Linnell Mikkelsen are married.  Defendant David Mikkelsen is Craig and Linnell's son.  Non-parties Duane and Margaret Mikkelsen are Craig's parents and David's grandparents.  Craig and Linnell own property at 13141 South New Era Road in Oregon City ("the Property").  In 1999, they borrowed $162,000 from United PanAm Mortgage.  They secured this loan by executing a deed of trust encumbering the Property ("the 1999 Deed of Trust").  The 1999 Deed of Trust was recorded in Clackamas County on October 26, 1999.  It was a first priority lien on the Property.  White June 17, 2016 Decl., Ex. 1 (1999 Deed of Trust), ECF 55-1.

     Also in 1999, Craig and Linnell borrowed $225,000 from Duane and Margaret.  They signed a promissory note.  The next year, on July 6, 2000, Craig and Linnell signed a trust deed ("the Mikkelsen Trust Deed") encumbering the Property to secure the loan from Duane and

2 - OPINION & ORDER

Margaret. Id., Ex. 3, ECF 55-1. Then, approximately fifteen months later, the Mikkelsen Trust

Deed was recorded in Clackamas County on October 3, 2001. The Mikkelsen Trust Deed was in

second position after the 1999 Deed of Trust.

In 2005, Craig and Linnell refinanced their mortgage on the Property. They borrowed

$225,000 from Option One Mortgage Corporation. As part of that transaction, the loan which

had been secured by the 1999 Deed of Trust was paid off in the amount of $166,640.35 and the

1999 Deed of Trust was reconveyed. Id., Exs. 4, 5, ECF 55-1. Craig and Linnell executed a new

deed of trust ("the 2005 Deed of Trust") encumbering the Property to secure the new Option One

loan. Id., Ex. 6, ECF 55-1. The 2005 Deed of Trust was recorded in Clackamas County on

October 27, 2005.

Before the Option One loan closed, Option One purportedly obtained a preliminary title

commitment from Ticor Title Insurance Company which did not disclose the Mikkelsen Trust

Deed. Id., Ex. 7, ECF 55-2. Option One also purportedly obtained a title insurance policy from

Ticor. Id., Ex. 8, ECF 55-2. The 2005 Title Insurance Policy did not disclose the Mikkelsen

Trust Deed as an exception. Thus, Plaintiff asserts, Option One believed that its 2005 Deed of

Trust was a first lien on the Property.

In 2007, Craig and Linnell refinanced the mortgage on the Property again. This time,

they borrowed $331,200 from Hyperion Capital Group, LLC. As part of that transaction, the

loan from Option One which had been secured by the 2005 Deed of Trust, was paid off in the

amount of $225,598.36 and the 2005 Deed of Trust was reconveyed. Id., Exs. 9, 10, ECF 55-2,

55-3. Craig and Linnell executed a new deed of trust ("the 2007 Deed of Trust") encumbering

the Property to secure the Hyperion loan. Id., Ex. 11, ECF 55-3. The 2007 Deed of Trust was

3 - OPINION & ORDER

recorded in Clackamas County on December 11, 2007.

Craig and Linnell failed to disclose the Mikkelsen Trust Deed or their loan from Duane and Margaret in their 2007 Loan Application to Hyperion. Id., Ex. 12, ECF 55-3. Before the Hyperion loan closed, Hyperion purportedly obtained a preliminary title commitment from Ticor which did not disclose the Mikkelsen Trust Deed. Id., Ex. 13, ECF 55-3. Hyperion also purportedly obtained a title insurance policy from Ticor which did not disclose the Mikkelsen Trust Deed as an exception. Id., Ex. 14, ECF 55-3. Thus, Plaintiff asserts that Hyperion believed that its 2007 Deed of Trust was a first lien on the Property.

On or about November 29, 2011, Margaret, for herself and as legal successor to Duane who had died, assigned the Mikkelsen Trust Deed and the promissory note for the $225,000 loan, to Defendant David Mikkelsen. Id., Ex. 15, ECF 55-4. That assignment was recorded in Clackamas County on December 11, 2011.

Plaintiff asserts that the 2007 Deed of Trust and the promissory note secured by the 2007 Deed of Trust have been assigned several times. Plaintiff, formerly named Green Tree Servicing LLC, is the current holder and beneficiary of the 2007 Deed of Trust.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting

former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

Before discussing the parties' respective motions, I address evidentiary and legal issues raised by the parties' briefing.

## I. Evidentiary Issues

Defendants object to Plaintiff's expert Gary Ehrig and to several documents. The document challenges, which are to Exhibits 4, 7, 8, 9, 12, 13, and 14 to White's June 17, 2016 Declaration, ECF 55, raise hearsay and authentication objections. The hearsay objections are

without merit because each of the exhibits is admissible as a business record under Federal Rule

of Evidence 803(6). The foundation for their admissibility as business records is laid by the

Declarations of Chantal P. Moon, a representative of Plaintiff, and Mariah Yee of Ticor Title

Insurance Company. ECF 69, 70. Those Declarations also cure any authentication objections. I

overrule Defendants' document objections.

In a June 16, 2016 Declaration, Ehrig states that he is a Senior Vice-President and Asset

Manager of Northwest Equity Holdings, Inc., in Vancouver, Washington. Ehrig June 16, 2016

Decl. ¶ 1, ECF 54. He has worked in the real estate finance field for almost forty years, working

as an executive in several banks and real estate finance companies. Id. ¶ 2. He has extensive

experience in residential lending. Id. Most of his work has been in the Pacific Northwest. Id.

His resume is attached as Exhibit 1 to that Declaration and his Amended Expert Report is Exhibit

2.

He subsequently completed a Second Amended Expert Report. White July 12, 2016

Decl. Ex. 1, ECF 67. In his Second Amended Expert Report, he states that in reaching his

opinions, he considered the following: (1) the First Amended Complaint; (2) the preliminary title

reports and title insurance policy issued to Option One; (3) the preliminary title reports and title

insurance policy issued to Hyperion; (4) the 2007 Loan Application submitted by Craig and

Linnell; (5) the deposition testimony of Craig, Linnell, and Grant Eggleston; (6) the Occupancy

and Financial Status Affidavit, signed by Craig and Linnell; and (7) the Uniform Underwriting

and Transmittal Summary. Id.

In his Second Amended Expert Report, Ehrig offers nine opinions on issues ranging from

industry practices of lenders making residential loans, to the residential loan market in 2005 and

6 - OPINION & ORDER

2007, and to whether Hyperion or Option One would have made the loans if they had realized that loan repayment was not going to be secured by a first position security interest on the Property.  Ehrig Sec. Am. Exp. Report ¶¶ 1-9.

Defendants argue, without citing to any law, that Ehrig's expert report[1] must be stricken and disregarded because (1) Ehrig never inspected the actual files of Hyperion or Option One, he did not speak to any employee of either lender, and he admits there could have been amendments to title reports and other communications from the title insurance company to the lender that he did not see; (2) Ehrig admits he does not know the state of knowledge of either lender at the time the loans were made, or whether either lender adhered to customary and industry standards in connection with their loans; and (3) Ehrig acknowledges that he does not know whether either lender was negligent.

The first argument goes to the weight, not admissibility, of Ehrig's opinion.  Federal Rule of Evidence 702 allows expert testimony if it is based on sufficient facts or data.  Fed. R. Evid. 702(b).  Ehrig's opinions are based on sufficient facts obtained from the documents he reviewed, as well as his knowledge of industry practice gleaned from many years working in the field. Although Defendants were provided with the files of Hyperion and Option One to the extent they are available, they fail to point to a particular document that they contend Ehrig did not review. Defendants' suggestion that some unidentified, hypothetical document exists and that it undermines Ehrig's opinion is not a sufficient basis upon which to strike his otherwise admissible testimony.  Additionally, both Hyperion and Option One are out of business and there are no

---

[1]  I construe Defendants' objections, which were addressed to Ehrig's Amended Expert Report, to have been brought against the Second Amended Expert Report.

7 - OPINION & ORDER

employees. Ehrig did read the deposition testimony of Eggleston who assisted the Mikkelsens with both loans. Again, Ehrig's opinions are based on sufficient facts and data. The fact that he did not interview any actual employees of either lender goes to weight, not to admissibility.

The next argument is also unavailing. Because neither lender is still in business, it is impossible to prove what knowledge they possessed at the relevant time or what procedures they followed. Nonetheless, Ehrig is able to provide an expert opinion based on documents, review of deposition testimony, and his expertise, that neither lender knew about the Mikkelsen Trust Deed before making its respective loan and both were commercially reasonable in making the loans. I agree with Plaintiff that Ehrig's lack of personal knowledge about the lenders' knowledge at the relevant time or what practices they followed does not negate his expert opinion based on his familiarity with industry custom and practices at that time.

Finally, as to the negligence argument, Plaintiff notes that while Ehrig testified that he does not know if either Hyperion or Option One was negligent in making their respective loans, he also testified that it would have been negligent for each lender to go ahead with the loan if the lender had reason to know of the Mikkelsen Trust Deed. Scannell July 12, 2016 Decl., Unnumbered Ex. (Ehrig Dep) 31:19-32:5, ECF 65. Plaintiff argues that the point here is whether either lender was "inexcusably negligent" and thus, Ehrig's opinion about negligence does not alter a conclusion or opinion that the lenders were not inexcusably negligent. Moreover, Plaintiff notes that in the Second Amended Report, Ehrig amends his opinions so they address the lenders' commercial reasonableness. He opines that the lenders were commercially reasonable to make loans based on borrowers' representations and title company reporting which did not disclose the Mikkelsen Trust Deed. This is an opinion properly within Ehrig's expertise and could support a

finding that the lenders were not inexcusably negligent. I agree with Plaintiff. There is no basis for striking Ehrig's expert report.

II.  Legal Issues

A.  Oregon Law on Equitable Subrogation

"A party bringing an equitable subrogation claim admits their title is subordinate but argues equity demands the court place them in front of the party with priority." Boresek v. U.S. Dep't of Ag., 109 F. Supp. 3d 1338, 1342 (D. Or. 2015). In Boresek, Judge McShane noted that a 1999 Oregon Court of Appeals decision "provided a concise description of the doctrine of equitable subrogation[.]" Id. (citing Dimeo v. Gesik, 164 Or. App. 567, 993 P.2d 183 (1999)). In that decision the Oregon court explained:

> "If the holder of a mortgage takes a new mortgage as a substitute for a former one, and cancels and releases the latter in ignorance of the existence of an intervening lien upon the mortgaged premises, although such lien be of record, equity will, in the absence of the intervening rights of third parties, restore the lien of the first mortgage and give it its original priority."

Dimeo, 164 Or. App. at 571, 994 P.2d at 185 (quoting Pearce v. Buell, 22 Or. 29, 33, 29 P. 78 (1892)) (brackets omitted).

Dimeo further explained that equitable subrogation "does not apply, however, unless the lender proves that it was ignorant of the existence of the intervening lien and that its ignorance was not a result of inexcusable negligence." Id. In support, Dimeo cited to two Oregon Supreme Court cases, Holzmeyer v. Van Doren and Metropolitan Life Insurance Co. v. Craven. Id. Holzmeyer held that a party seeking equitable subrogation must have been "ignorant of the existence" of the intervening lien. 172 Or. 176, 185, 139 P.2d 778, 782 (1943). Metropolitan Life had previously held that equitable subrogation was available only if "the party advancing the

9 - OPINION & ORDER

money to defray the prior lien is not guilty of negligence[.]"  164 Or. 274, 283, 101 P.2d 237, 241 (1940).

In a 2013 case, Judge Papak also cited to Metropolitan Life, Dimeo, and other cases for the proposition that under Oregon law, the lender seeking equitable subrogation must establish that it was ignorant of the prior lien and that its ignorance was not because of inexcusable negligence.  Wells Fargo Bank, N.A. v. Clunas Funding Group, Inc., No. 3:11-cv–01556-PK, 2013 WL 4514013, at *5-6 (D. Or. July 22, 2013), adopted by J. Hernandez (D. Or. Aug. 22, 2013).  Judge Papak explained that in Metropolitan Life, the court's discussion

> of its own prior equitable subrogation cases makes clear that, in the absence either of an affirmative misrepresentation to the subsequent, refinancing lender that no intervening lien exists or of proof of the refinancing lender's ignorance of the intervening lien notwithstanding the refinancing lender's appropriate diligence, equitable subrogation is not available to the refinancing lender.

Id. at *5 (relying on Metropolitan Life, 164 Or. at 280-83, 101 P.1d at 239-41); see also id. ("'one[] advancing money to discharge a prior lien on real or personal property and taking a new mortgage as security is entitled to subrogation to the prior lien as against the holder of an intervening lien of which he was excusably ignorant' and not otherwise") (quoting Metro. Life, 164 Or. at 279, 101 P.3d at 239).  Judge Papak also noted that although the Oregon Supreme Court had not addressed equitable subrogation "since the first half of the twentieth century," the Oregon Court of Appeals had more recently "repeatedly affirmed the Oregon Supreme Court's equitable subrogation jurisprudence," making clear that a "refinancing lender's *actual knowledge* of the intervening lien does defeat a claim to equitable subrogation."  Id. at *6 (citing, inter alia, Dimeo, 164 Or. App. at 571, 993 P.2d at 185).

In applying Oregon law as he explained it, Judge Papak rejected the Plaintiff's argument

that the court should follow the law as adopted in the Restatement (Third) of Property: Mortgages § 7.6, which a number of states follow.  Id.  Courts following the Restatement disregard whether the subsequent lender had actual knowledge of the intervening lien, "on the theory that a lender's decision to refinance a borrower's loan ought not to impact the seniority of an intervening mortgage, the terms of which were negotiated on the assumption that the intervening mortgage would be junior to the original first-position lien[.]"  Id.  Judge Papak applied Oregon law because, he said, "[w]hatever the relative merits" of the law of Oregon and the Restatement, Oregon had not adopted the Restatement but had continued to apply the contrary rule, also followed by a number of jurisdictions, "that equitable subrogation is available only to subsequent lenders able to establish actual ignorance of an intervening loan notwithstanding such lenders' commercially reasonable diligence."  Id.

In the instant case, Plaintiff argues that I should depart from Metropolitan Life, Dimeo, and similar cases.  Plaintiff urges me to follow the 1975 Oregon Supreme Court case of W.J. Seufert Land Co. v. Greenfield, 273 Or. 408, 541 P.2d 816 (1975), which Plaintiff argues adopted an unjust enrichment theory for equitable subrogation and ignores the issue of whether the new lender had knowledge of the preexisting lien and makes any negligence by the new lender irrelevant.  Plaintiff argues that Seufert Land has not been overruled by the Oregon Supreme Court and that when it is applied here, the only material facts are that Option One paid off the United PanAm loan which was in first position, and Hyperion then paid off the Option One loan.  Thus, Plaintiff continues, in 2007 when Hyperion paid off the Opinion One loan, Hyperion became subrogated to United PanAm's interest as the lienor in first position.  Plaintiff argues that this is the correct result because under an unjust enrichment analysis, it is not relevant

whether Hyperion or Option One was negligent, and if equitable subrogation is not applied, Craig

and Linnell will obtain a windfall as David has no intention of enforcing repayment of the

Mikkelsen loan.  To prevent this windfall, Plaintiff argues that the doctrine should apply to the

extent of the repayment of the United PanAm loan, $166,640.35, plus interest, costs, and

attorney's fees.[2]

I disagree with Plaintiff and instead follow Judge Papak and Judge McShane by applying

Oregon law as explained in Metropolitan Life and as further adhered to and explained by Oregon

Court of Appeals cases such as Dimeo.  While Seufert Land is also an Oregon Supreme Court

case, it came after Metropolitan Life, yet made no mention of the prior decision and certainly did

not expressly overrule it.  Seufert Land does not mention the term "equitable subrogation" and

never mentions the term subrogate.  Given that, Metropolitan Life continues to control.  See, e.g.,

Hart v. Massanari, 266 F.3d 1155, 1171 (9th Cir. 2001) (a "decision of the Supreme Court will

control that corner of the law unless and until the Supreme Court itself overrules or modifies it").

Not a single case after Seufert Land has cited it at any time for any proposition.  This suggests it

has limited application.

Finally, Seufert Land involved a claim described by the court as a "creditor's bill" in

which the plaintiff sought to impose a judgment lien on homestead property.  273 Or. at 409, 541

P.2d at 815.  The court was presented with a different fact scenario than what occurred here.  Its

reasoning is applicable at all only by analogy and thus, it cannot be seen as a controlling decision

---

[2] Plaintiff seeks summary judgment only on its equitable subrogation claim.  Plaintiff also brought an unjust enrichment claim.  It is unclear if that claim is truly an alternative claim to the equitable subrogation claim, or is just an alternative theory of equitable subrogation as Plaintiff argues here.

or one that overruled Metropolitan Life which expressly announced the proper analysis for

"equitable subrogation" claims.  I reject Plaintiff's argument that Seufert Land applies.  As a

result, Plaintiff's ignorance of the Mikkelsen Trust Deed is relevant as is whether that ignorance

was due to inexcusable neglect.

    B.  Application of Equitable Subrogation Theory to Multiple Loan Payoffs

      Defendants argue that equitable subrogation cannot apply to make Plaintiff a first priority

lien holder because no Oregon cases support application of the doctrine to the serial subrogation

of mortgages.  Defendants note that if even Plaintiff demonstrates that Hyperion qualifies for

equitable subrogation, Plaintiff is still not entitled to the relief it seeks because the lien of Option

One was also subordinate to the Mikkelsen Trust Deed.  To prevail, Plaintiff must seek a second

subrogation to the lien of United PanAm.  Defendants argue that Plaintiff cites no authority

entitling it to subrogation respecting a party with which it had no relation.

      Even if the law allows an equitable subrogation theory to apply to multiple mortgages,

Defendants rely on a bankruptcy case from Arizona for the proposition that a would-be subrogee

must still satisfy the elements for subrogation as to each of the prior lenders to which it wishes to

be subrogated.  Jeffrey C. Stone, Inc. v. Central & Monroe, LLC (In re Mortgs., Ltd.), 444 Bankr.

585 (Bankr. Ariz. 2011).  There, the lender seeking equitable subrogation (Mortgages Ltd.) had

secured a deed of trust in 2007 by paying off a 2006 loan of a different lender (Choice Bank)

which in turn had paid off a previous loan from Mortgages Ltd.  All in all, there had been four

loans on a piece of property which was the site of a commercial construction project such that the

first loan secured by a deed of trust in 2002, had been replaced by one in 2005, which had been

replaced by one in 2006, which had been replaced by one in 2007.  The lender was seeking

13 - OPINION & ORDER

equitable subrogation to allow it to assert the lien priority position it had in 2006.

The court, in allowing equitable subrogation over the objections of mechanics lienholders, wrote that although "[n]o party has been able to cite a case applying equitable subrogation in this daisy-chain fashion[,]" a "two-step subrogation seems to be entirely consistent with the general principles and purposes of the doctrine." Id. at 597. The court explained that the "effect of equitable subrogation is simply to substitute one lien holder to the lien-priority position of a prior lien holder." Id. at 597-98. If Mortgages Ltd. could satisfy all the elements of the doctrine, the court concluded there was nothing "inherent in the doctrine that would preclude Mortgages from asserting it on behalf of Choice Bank, to give the Choice Bank deed of trust the lien-priority position of the prior Mortgages' deed of trust." Id. at 598.

In addition to Mortgages Ltd., Plaintiff cites to two other cases which have applied equitable subrogation to a series of refinancings. In a written opinion issued by a Massachusetts trial court, the court applied the doctrine of equitable subrogation even though there were intermediate refinancings. Hare v. LPP Mortg., Ltd., No. MICV2001-091571-C, 30 Mass. L. Rptr. 651, 2013 WL 951152, at *3-4 (Mass. Sup. Ct. Mar. 8, 2013). In the other case, a 1935 trust deed paid off a 1929 trust deed and then a 1936 trust deed paid off the 1935 trust deed. Howell v. Dowling, 52 Cal. App. 2d 487, 126 P.2d 630 (1942). The court there held that the 1936 trust deed was subrogated to the priority of the 1929 trust deed over an intervening lien. Id. at 498-99, 126 P.2d 630.

Although Defendants are correct that no Oregon case has applied the doctrine of equitable subrogation to multiple refinancings, Defendants also cite to no case from any jurisdiction where a court has refused to apply the doctrine. I see no reason not to follow the cases that have applied

the doctrine to multiple refinancings, as long as Plaintiff can establish the elements of the claim as to each lender.  That is, Plaintiff has to show that both Hyperion and Option One were ignorant of the Mikkelsen Trust Deed and that the lenders' ignorance was not the result of inexcusable negligence.

    C.  Claim Preclusion

       In 2010, BAC Home Loans Servicing, LP (BAC) sued Craig and Linnell in Clackamas County Circuit Court.  At the time, BAC was the holder and beneficiary of the 2007 Deed of Trust.  In the lawsuit, BAC sought to have the legal description of the Property reformed.  Defs.' Mot., Ex. 7 (2010 BAC Compl.); ECF 57-1.  BAC sought a declaratory judgment declaring that the 2007 Deed of Trust include and encumber an additional parcel of land, referred to as Parcel II, that was part of the Warranty Deed.  BAC alleged that it was the intent of BAC's predecessor-in-interest as well as the intent of Craig and Linnell that as part of the loan, Craig and Linnell would grant the Deed of Trust as to the entire property, but contrary to those intentions, the legal description of the property contained in the Deed of Trust omitted Parcel II.  Id. ¶ 12.  The lawsuit was resolved with a stipulated judgment dismissing the case with prejudice dated November 7, 2011.  Id., Ex. 8.

       In the Clackamas County Complaint, BAC expressly acknowledged the presence of, and the superiority of, the Mikkelsen Trust Deed.  BAC alleged that at the same time and place as the execution and delivery of the promissory note, and as part of the same transaction, the Mikkelsens executed the 2007 Deed of Trust by which they "deeded in trust . . . all the Property, . . . subject to a pre-existing Trust Deed recorded October 3, 2001 as Fee No. 2001-081404 (the 'Senior Deed')."  2010 BAC Compl. ¶ 7 (emphasis added).  The "Senior Deed" referred to is the

15 - OPINION & ORDER

Mikkelsen Trust Deed. BAC also alleged that the 2007 "Deed of Trust is a valid lien on the Property, subject only to the Senior Deed." Id. ¶ 10.

Defendants argue that the claims brought by Plaintiff in this case are precluded under the theory of claim preclusion, by the claim in the Clackamas County case. They contend that the claims here arise out of the same factual transaction as the claim in the Clackamas County case and that the claims here could have been asserted in the earlier case. Plaintiff argues that the claims here are not part of the same factual transaction as the claim in the Clackamas County case.

"Res judicata, or claim preclusion, prohibits lawsuits on any claims that were raised or could have been raised in a prior action." Stewart v. U.S. Bancorp, 297 F.3d 953, 956 (9th Cir. 2002) (internal quotation marks omitted). The preclusive effect of a prior judgment in a diversity action is determined by the law of the state in which the diversity court sits. Semtek Int'l, Inc. v. Lockheed Martin Corp., 531 U.S. 497, 508 (2001); see also Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 884 (9th Cir. 2007) (same).

In Oregon,

> a plaintiff who has prosecuted one action against a defendant through to a final judgment binding on the parties is barred on *res judicata* grounds from prosecuting another action against the same defendant where the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks a remedy additional or alternative to the one sought earlier, and is of such a nature as could have been joined in the first action.

Bloomfield v. Weakland, 339 Or. 504, 510-11, 123 P.3d 275, 279 (2005) (internal quotation marks omitted, emphasis added). "The [claim preclusion] rule forecloses a party that has litigated a claim against another from further litigation on that same claim on any ground or

16 - OPINION & ORDER

theory of relief that the party could have litigated in the first instance." Id. at 511, 123 P.3d at

279.  "[A] person who was not a party to an earlier action but who was in 'privity' with a party to

that earlier action also can be barred on claim preclusion grounds from bringing a second

action[.]" Id.

   1.  Privity

  A "person may be bound by a previous  adjudication either by reason of being a party in

the case, or by reason of participation which is substantially equivalent to having been a party, or

from having a legal relationship that is derived from one who was a party." State Farm Fire &

Cas. Co. v. Reuter, 299 Or. 155, 160–61, 700 P.2d 236, 239–40 (1985).  In a 2011 case, I

explained that "[t]here are 'three general categories of parties that may be in privity with parties

to earlier litigation:  (1) those who control an action though not a party to it; (2) those whose

interests are represented by a party to the action; and (3) successors in interest to those having

derivative claims.'" Lettenmaier v. Fed. Home Loan Mortg. Corp., No. 3:11-cv-00156-HZ, 2011

WL 3476648, at *8 (D. Or. Aug. 8, 2011) (quoting Secure Invs., LLC v. Anderegg, 188 Or. App.

154, 167, 71 P.3d 538, 545–46 (2003)).

  A successor-in-interest to real property falls under the third "general category" of

recognized privity relationships.  Id.; see also Glover v. Wachovia Equity Servicing LLC, No.

03:11-cv-00210-HU, 2011 WL 3794828, at *6 (D. Or. July 18, 2011) (concluding that Wachovia

and Wells Fargo, as subsequent assignees of the debt, stood in the shoes of, and were in privity

with, the original lender and trustee; further noting that "[b]eing in 'privity' with another simply

means the relationship between the one who is a party on the record and another is close enough

to include the other within the res judicata.") (citing State ex rel. Adult & Fam. Servs. Div. v.

Lester, 45 Or. App. 389, 392, 608 P.2d 588, 590 (1980) ("An assignee stands in the shoes of his assignor")) (internal quotation marks omitted); adopted by J. Hernandez, 2011 WL 3794760 (D. Or. Aug. 26, 2011).   Given Plaintiff's admission that it is BAC's successor-in-interest via assignment, there is no dispute that Plaintiff is in privity with BAC.

        2.   Same Factual Transaction

There is also no dispute that BAC could have raised an equitable subrogation claim in the 2010 Clackamas County case because it was aware of the Mikkelsen Trust Deed and its superior lien position at the time BAC brought that case.   The issue is whether the equitable subrogation claim here is based on the same factual transaction that was at issue in the earlier litigation.

Plaintiff argues that the Clackamas County case involved the single issue of whether the correct legal description of the property appeared in the 2007 Deed of Trust.   In contrast, the claim here involves the question of whether the previous lenders knew about the Mikkelsen Trust Deed before making their loans and assuming they did not, whether their failure to discover the Mikkelsen Trust Deed was excusable.   Plaintiff argues that the facts involved in the two cases do not constitute a single transaction for purposes of applying claim preclusion.   Defendants argue that because both the Clackamas County case and the instant case seek declaratory relief in an attempt to correct alleged errors regarding the nature of the collateral security for the 2007 Hyperion loan, they arise out of the same factual transaction.

In a 1990 case, the Oregon Supreme Court noted that claim preclusion is based on policies which include preventing splitting of a dispute into separate controversies.   Drews v. EBI Cos., 310 Or. 134, 141, 795 P.2d 531, 535 (1990).   The Drews court stated that "[t]o prevent splitting of the dispute or controversy, courts employ a broad definition of what could have been

18 - OPINION & ORDER

litigated." Id. at 141, 795 P.2d at 536.  The doctrine applies "with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Id. (internal quotation marks omitted).

In a 2012 case, the Oregon Court of Appeals referred to the "expansive transactional approach" under which "claim preclusion bars not only claims that have been actually litigated, but any claim arising out of the same transaction or series of connected transactions." Lucas v. Lake Cty., 253 Or. App. 39, 54, 289 P.3d 320, 329 (2012) (internal quotation marks and brackets omitted).  Turning to the more specific issue of what constitutes the same "transaction," the court explained that "[i]n determining whether a set of facts constitutes a single transaction, we . . . rely on the approach expressed in section 24(2) of the *Restatement*, which gives weight to such considerations as whether the facts are related in time, space, origin, or motivation and whether they form a convenient trial unit." Id. (internal quotation marks and brackets omitted).  In Lucas, a prior defamation claim concerned a single false statement - that plaintiff had cheated on a certification exam and encouraged another employee to do so as well.  The statement was made by another employee to create, as the plaintiff asserted, a pretextual justification for the plaintiff's later termination. Id.  The plaintiff sought damages only for emotional distress and the harm to his reputation.

In contrast, although a later blacklisting claim concerned communications about the plaintiff's dishonesty and unfitness, it addressed a different factual transaction because the blacklisting claim involved communications occurring over a substantial period of time after the plaintiff's termination that were distinct from the single communication that was the basis for the defamation claim. Id. at 55, 289 P.3d at 329.  Additionally, the court explained, the "gravamen

of plaintiff's federal action [in which the defamation claim had been brought] was that his

termination was wrongful." Id.  The defamation claim "functioned as a vehicle for plaintiff to

establish that defendant's purported reason for terminating him was pretextual." Id.  In contrast,

the blacklisting claim alleged that the defendant was motivated by a different purpose of

attempting to disqualify the plaintiff from certification as a police officer and prevent his

employment in the state as a policy or corrections officer. Id.  With those distinctions, the court

concluded that the blacklisting claim was not part of the same factual transaction that had been

litigated in the defamation claim. Id.

       In an earlier case, the Oregon Court of Appeals reversed the trial court's determination

that a claim asserting a statutory way of necessity was precluded by an earlier claim regarding a

prescriptive easement through the land. Nice v. Priday, 149 Or. App. 667, 945 P.2d 559 (1997).

The plaintiffs' only auto access to their land was by a gravel road across the defendants' land, a

road which had been used by the plaintiff and their predecessors since 1920.  In 1993, the

plaintiffs sought a prescriptive easement through the defendants' land.  The appellate court ruled

against the plaintiffs, holding that the use of the access road always had been permissive. Id. at

669, 945 P.2d at 561.  Then, the plaintiffs petitioned the circuit court for a statutory way of

necessity, a proceeding available to owners of landlocked property who have no other

enforceable access. Id.  In their petition, the plaintiffs listed the prior adverse decision on the

easement as evidence that they did not have an existing easement or right to an easement to

provide access to a public road or any other enforceable access. Id.  The defendants moved for

summary judgment on the basis of claim preclusion.  The trial court granted the motion.

       On appeal, in comparing the earlier action for a prescriptive easement with the current

20 - OPINION & ORDER

statutory way proceeding, the court observed that the statutory way petition was not an adversarial action and was not an additional or alternative means to the same end. Id. at 671-72, 945 P.2d at 562.   A private action for a prescriptive easement results, if it is successful, in a property interest that runs with the land and constitutes a private right of way over the servient estate of another. Id.  In contrast, a statutory way of necessity creates public access to landlocked property through a route determined, owned, and controlled by the county. Id.  The court explained: "an action for a prescriptive easement and a petition for a way of necessity involve different legal processes, different parties, a different transaction and set of facts and have different legal consequences." Id.  Thus, there was no claim preclusion. Id.

Although the "same transaction" standard is interpreted broadly, the equitable subrogation claim in this case is not precluded by the earlier reformation claim in the Clackamas County lawsuit.  While both claims involve the 2007 Deed of Trust, they do not arise out of the same factual transaction.  In the earlier case, BAC was attempting to correct an error which resulted in the Warranty Deed and the 2007 Deed of Trust having inconsistent property descriptions.  While recognizing its second position status, the lender was concerned only with fixing an error appearing on the face of the 2007 Deed of Trust.  The instant case challenges nothing about the face of the 2007 Deed of Trust.  The description of the collateral is irrelevant to the claim here.  It does not matter whether the deed includes Parcel II as part of the encumbered property.  The Clackamas County case was much narrower in scope, addressing only the omission of a piece of land from the property description.  The instant case addresses multiple transactions in 2005 and 2007 involving the loan application, title insurance, and industry practice and standards.  As Lucas noted, the relevant facts are not related in time, space, origin, or motivation.

Moreover, the result of the Clackamas County case had no impact on the relative lien priority positions of the parties. And, the result of this case has no impact on the nature of the collateral. Because of this, Duane and Margaret, who then were the beneficiaries of the Mikkelsen Trust Deed, were not named in the Clackamas County case. This underscores the difference in the nature of the claims. Duane and Margaret, and now David, as beneficiaries of the Mikkelsen Trust Deed, are not concerned with the description of the collateral. Their concern is with the priority of the Mikkelsen Trust Deed. Because BAC acknowledged the first position of that deed in the Clackamas County case, Margaret/Duane/David had no motivation to concern themselves with the description of the property in what is a subordinate deed. Craig and Linnell, however, as debtors on the second priority interest, do care about the description of the collateral. But, if the current first priority interest was not to secure a family loan, Craig and Linnell would likely have no interest in the priority fight because typically, the borrower is unconcerned as to whom the debt is owed. See Wells Fargo, 2013 WL 4514013, at *7 ("from the borrower's perspective it is effectively immaterial which of several liens on the borrower's property is senior and which is junior").

The facts involved in the claims are different. The claims are motivated by different interests. And the end result of litigating both claims is distinct. Accordingly, the claims do not arise from the same factual transaction and the claims in this case are not precluded.

D. Remaining Legal Issues

Defendants argue that Plaintiff cannot pursue an equitable claim because Plaintiff has an adequate remedy at law in the form of a suit against the title insurance company or a breach of warranty claim against Bank of America. Although there are no Oregon cases addressing the

issue in this context, cases from other jurisdictions have concluded that Plaintiff need not establish the lack of a legal remedy before proceeding on an equitable subrogation theory. E.g., Bank of Am., N.A. v. Diamond Fin., LLC, 88 Mass. App. Ct. 564, 559, 42 N.E. 3d 1151, 1156-57 (2015) (concluding that the "equitable remedy sought is fundamentally different than any potential remedy at law" and that any legal remedy was inadequate because money damages do not restore the plaintiff to its rightful senior position); Bank of N.Y. Mellon v. Withers, 771 S.E. 2d 762 , 765 (N.C. Ct. App. 2015) (explaining that the "remedies defendants identify are inadequate because of the failure to account for the unique nature of real property . . . Due to land's unique nature, damage claims against individuals are an inadequate substitute for a first position lien on real property"); see also Hicks v. Londre, 107 P.3d 1009, 1013 (Colo. App. 2004) (court rejected argument that equitable subrogation claim could not be brought because of the ability to file a legal claim against title insurer:  "To bar an equitable remedy, a legal remedy must lie against the opposing party and not against third parties who are not before the court."), aff'd, 125 P.3d 452 (Colo. 2005).  I agree with the reasoning of these cases and reject Defendants' argument.

Next, Defendants suggest that Plaintiff is not entitled to relief because when Hyperion's 2007 Deed of Trust replaced Option One's 2005 Deed of Trust, Option One's deed was already in second position.  That is, Hyperion's deed simply replaced Option One's second mortgage lien with its own.  As a result, Defendants maintain that Plaintiff cannot establish that the Mikkelsens would be unjustly enriched absent equitable subrogation because no benefit was conferred on them.  Defendants' argument overlooks that Plaintiff seeks equitable subrogation as to both the Hyperion and Option One loans.  Because the Option One 2005 Deed of Trust was

arguably erroneously in second position after the Mikkelsen Trust Deed, a benefit was conferred on the Mikkelsens earlier in the chain.

Defendants also argue that Plaintiff is entitled to no relief because it acquired the 2007 Deed of Trust for no consideration. Defendants maintain that without consideration, the denial of equitable subrogation is required to prevent a windfall to Plaintiff. In addition to citing no law in support of this position, Defendants' point is irrelevant. Plaintiff is the current beneficiary of the 2007 Deed of Trust and is therefore entitled to enforce that deed. Without equitable subrogation, Plaintiff will be unable to enforce its rights as beneficiary. The fact that Plaintiff obtained its interest without consideration is of no import.[3]

III.  Discussion

A.  Defendants' Motion

Defendants seek summary judgment on the basis that Plaintiff cannot prove as to Hyperion or as to Option One, that the lender was actually ignorant of the intervening lien and cannot prove the absence of inexcusable neglect. Defendants rely heavily on Judge Papak's 2013 decision in Wells Fargo. Because that case is distinguishable and because Plaintiff submits evidence creating issues of fact on ignorance and inexcusable neglect, I deny Defendants' motion.

Like the instant case, Wells Fargo involved a fight between two lienholders to certain property owned by a third party named Scott Henry. 2013 WL 4514013, at *2-3. Henry had obtained a mortgage in 2005 from World Savings Bank (WSB) whose parent company later merged, in 2009, with Wells Fargo at which time WSB apparently ceased to exist. Id. at *4. The

_____

[3] Given that I deny Defendants' motion and grant Plaintiff's motion, I do not address Defendants' legal argument that they are entitled to attorney's fees if they prevail.

mortgage loan for $273,000 was secured by a deed of trust on Henry's property (the 2005 Deed of Trust) which was recorded in Clackamas County and showed WSB as the first position lien. Id. at *2.

In February 2006, Henry obtained a loan for $67,000 from the defendants which was secured by a deed of trust on the property (the 2006 Deed of Trust) and which was recorded in Clackamas County as junior to the 2005 Deed of Trust. Id. Then, in March 2007, Henry refinanced the 2005 mortgage with WSB. Id. at *3. The new loan was for $340,000 and was secured by a deed of trust on the property (the 2007 Deed of Trust). As part of the application process, Henry contacted the defendants to request that the loan be subordinated to the expected new security interest to be granted to WSB which would replace the 2005 Deed of Trust. Id. The defendants declined. As part of the loan closing, WSB obtained a "Title Commitment" from a title company that listed the 2005 Deed of Trust as an existing interest but did not list the 2006 Deed of Trust. Id. The loan closed and the 2007 Deed of Trust was recorded in Clackamas County. The proceeds of the loan paid off the 2005 loan and the 2005 Deed of Trust was reconveyed to Henry. WSB's closing instructions contemplated that the 2007 Deed of Trust was to be recorded as a first priority security interest, but it was not so recorded. Instead, it was recorded without any indication of its superiority to the defendants' recorded prior interest. Id.

Wells Fargo sued the defendants to resolve the priority dispute. Both parties moved for summary judgment. In denying the plaintiff's motion, Judge Papak cited three different facts which could allow a factfinder to infer that WSB had actual knowledge of the 2006 Deed of Trust at the time it entered into the 2007 loan transaction. Id. at *7. First, he cited to Henry's express request to the defendants that the defendants subordinate the 2006 loan to the

25 - OPINION & ORDER

contemplated 2007 loan.  Id.  He concluded that the fact that Henry posed the request "strongly suggests that he did so at WSB's behest, with the implication that WSB had knowledge of the 2006 deed of trust at or around the time the 2007 loan closed."  Id.  Next, he noted that the 2006 Deed of Trust had been recorded.  Id.  In Judge Papak's opinion, a finder of fact could reasonably infer from the recording of that deed that WSB either had actual knowledge of the defendants' prior interest in the property or that WSB had failed to exercise commercially reasonable diligence in conducting the title search before entering into the 2007 loan transaction.  Id.  Third, he found that there was "no necessary inference" from the 2007 Title Commitment's failure to reveal the 2006 lien or from the fact that WSB's closing instructions were that the 2007 Deed of Trust was to be in first position, that WSB lacked actual knowledge of the 2006 Deed of Trust or that WSB had exercised commercially reasonable diligence in determining the existence of recorded liens on the property before entering into the 2007 loan transaction.  Id.

Judge Papak then turned to the defendants' motion.  The plaintiff argued that a factfinder could reasonably infer from the Title Commitment that WSB did not know of the 2006 Deed of Trust when it entered into the 2007 loan transaction.  Id.  The plaintiff further argued that a factfinder could reasonably infer from the Title Commitment and WSB's closing instructions that WSB's ignorance of the 2006 Deed of Trust was commercially reasonable.  Id.

Judge Papak rejected the plaintiff's argument.  Judge Papak assumed that it was permissible to infer from the Title Commitment's failure to reveal the 2006 Deed of Trust that WSB lacked actual knowledge.  Id. at *8.  But, even with that inference, he still concluded that the "evidence of record simply does not permit the inference that WSB's ignorance of the 2006 deed of trust was commercially reasonable."  Id.  He relied on the testimony of the plaintiff's

senior manager who stated that Wells Fargo did not have current information about whether WSB complied with its own policies in issuing the loan. Id. at **3, 8. Judge Papak explained that the manager's testimony that it was no longer possible to determine what WSB's procedures were in 2007 for refinancing mortgage loans or to determine whether WSB followed its own procedures meant that Wells Fargo could not establish that WSB's ignorance was commercially reasonable. Id. at*8. Additionally, even absent that testimony, he agreed with the defendants that Wells Fargo's evidence was insufficient to support an inference that WSB's ignorance of the 2006 Deed of Trust was commercially reasonable under the circumstances because that evidence did not address the standards by which commercial reasonableness could or should be measured. Id.

Defendants argue that Wells Fargo bears a "remarkable resemblance" to the facts here. They contend that Plaintiff here is in exactly the same position as the plaintiff in Wells Fargo because it is unable to determine the status of Hyperion's or Option One's knowledge when it made the 2007 and 2005 loans, respectively, or if either of those lenders was negligent in researching the state of the title before making a loan. Defendants note that in Wells Fargo, the court declined to adopt the argument that the use of a title commitment was per se proof of commercial reasonableness or even that it created an issue of material fact on that issue. Thus, based on Wells Fargo, Defendants argue that Plaintiff cannot meet its burden to show its actual ignorance of an intervening loan or that its ignorance was not due to inexcusable neglect.

The notable difference between the instant case and Wells Fargo is Ehrig's testimony. First, however, in contrast to Wells Fargo, there is no evidence in this record to show that the borrowers, Craig and Linnell, asked Margaret and Duane to subjugate their lien to Option One's

lien or to Hyperion's lien. Thus, there is no request from the borrower "strongly suggest[ing]" that the request was actually from the lender. As a result, the inference that the lender in either of the 2005 or 2007 loans had actual knowledge of the Mikkelsen Trust Deed when the 2005 or 2007 loans were made cannot be based on any communications from Craig and Linnell to Duane and Margaret.

Second, Judge Papak did not have testimony from an escrow officer. Yee was the Escrow Officer for both loans. Yee Decl. ¶¶ 2. She has been an Escrow Officer for Ticor Title Insurance since August 2004. Id. at ¶ 1. She prepared the Title Commitments in connection with both loans. Id. at ¶¶ 5, 7. Although she does not have an email or cover letter confirming that she sent the documents to the lenders, she is confident she did so in the regular and ordinary course of business. Id. Notably, she states that she is aware from her years of experience as an Escrow Officer, that lenders do not close out a loan refinance transaction unless they had previously received a preliminary title report or title commitment. Id. Similarly, she prepared the title insurance policies issued by Ticor in connection with both refinance transactions. Id. at ¶¶ 6, 8. And, while she also lacks an email or cover letter confirming that she sent the policies to the lenders, she is aware based on her years of experience as an Escrow Officer, that lenders do not close a loan refinance transaction unless they receive a title insurance policy. Id.

Third, Ehrig's testimony establishes that (1) it was industry practice that lenders did not make residential loans unless the repayment of the loan was secured by a first position security interest on the property; (2) lenders rely on disclosures from the borrower as well as title reports from reputable title insurance companies to ensure they will be secured by a first position security interest; and (3) it was commercially reasonable for Hyperion and Option One to rely on

the reporting from the title insurance company which concluded that Hyperion and Option One would hold first priority security interests in the property.   Ehrig Sec. Am. Exp. Report ¶¶ 1, 2, 7, 9.

In considering this evidence in a light most favorable to Plaintiff, the non-moving party, a reasonable factfinder could conclude that Hyperion and Option One had no knowledge of the Mikkelsen Trust Deed and that such ignorance was not due to inexcusable neglect.   The factfinder could also conclude that both lenders acted in a commercially reasonable manner. Defendants overstate the conclusion in <u>Wells Fargo</u>.  Judge Papak did not conclude that absent a witness actually employed by the prior lender to testify about that lender's routine practices and conduct in regard to the prior loan, the current beneficiary cannot meet its burden in support of equitable subrogation.   That would be an unwarranted extension of <u>Wells Fargo</u>.  Plaintiff here, with the Yee Declaration and Ehrig's testimony, produces evidence showing that the lenders received title commitments which did not reveal the Mikkelsen Trust Deed and that it was commercially reasonable for lenders to rely on title commitments from reputable title companies and loan documents from borrowers to conclude that the lender would be in a first priority security position.   Accordingly, Defendants are not entitled to summary judgment.

B.  Plaintiff's Motion

Plaintiff argues that based on undisputed facts that (1) Hyperion paid off the 2005 Option One loan which paid off the 1999 United PanAm loan in the amount of $166,640.35; (2) Craig and Linnell did not disclose the Mikkelsen Trust Deed to Hyperion in the 2007 Loan Application; and (3) Hyperion and Option One relied on preliminary title commitments and title insurance policies that did not disclose the Mikkelsen Trust Deed, recent Oregon Court of

29 - OPINION & ORDER

Appeals cases refusing to apply the doctrine of equitable subrogation are distinguishable and Plaintiff is entitled to summary judgment.  I agree with Plaintiff.

Defendants first attempt to create an issue of fact regarding Option One's and Hyperion's knowledge of the Mikkelsen Trust Deed.  They suggest that without evidence from an employee of either lender, there is no actual proof that either lender received the title report information from Ticor.  As noted in the context of discussing Defendants' motion, Yee's Declaration makes clear that in the regular course of business, she sends the preliminary title report and then the title insurance policy to the lender involved in the loan.  Yee Decl. ¶¶ 2, 5-8.  Although lacking an email or cover letter confirming the transmission of the appropriate documents for the 2005 and 2007 lenders, she explains that she is confident she did so.  Id. at ¶¶ 3-8.  She also states that based on her years of experience, a lender would not close a loan refinance transaction absent receiving the preliminary title report and a title insurance policy.  Id.  The only reasonable conclusion from Yee's Declaration is that Option One and Hyperion received the preliminary title reports and the title insurance policies sent to them by Yee.  It is undisputed that these documents did not reveal the existence of the Mikkelsen Trust Deed.

Next, Defendants rely on the Declaration of Craig Mikkelsen in which he states that when applying for the loan in 2007, he and Linnell used Paramount Mortgage, a Lake Oswego loan broker.  C. Mikkelsen Decl. ¶ 2, ECF 64.  Paramount told the Mikkelsens that the loan was being requested from a lender named Hyperion and that Paramount would be responsible for obtaining and transmitting to the lender the information necessary for the loan application and related documents.  Id.  Craig states that "[t]he representative of Paramount with whom we worked was informed that my wife and I had obtained a loan from my parents in about 1999 that had not been

repaid."  Id. ¶ 4.  Further, the representative "was informed that my parents did not require periodic payments on their loan and would be repaid upon sale of the property absent other arrangements."  Id.  With this, Defendants argue that Paramount was Hyperion's agent and that Craig's disclosures to Paramount regarding the existence of the [loan from Duane and Margaret] were tantamount to disclosures to Hyperion."  Defts' Opp. 11, ECF 62.

I disagree.  Putting aside that Craig's statements in his Declaration are contrary to the Loan Application he and Linnell signed on December 3, 2007 which failed to list any prior liens on the Property[4], their statements are still insufficient to create an issue of fact as to whether Hyperion knew of the Mikkelsen Trust Deed.[5]  While Craig states that Paramount "was informed" about the loan from Duane and Margaret, Craig fails to state that anyone told Paramount that repayment of the loan was secured by a trust deed encumbering the Property.  This is critical.  Even assuming that Paramount's actions bind Hyperion, knowledge by a lender of nothing more than an outstanding unsecured loan from a borrower's parents that the borrower believes will be paid when property is sold, does not, without more, indicate that there is an actual recorded prior lien on the Property which would interfere with the lender's priority rights

---

[4]  The loan application from the 2005 loan is not in the record.  I assume it does not exist given that all documents from both the Option One and Hyperion files have been produced to Defendants, and neither side submits the application.  However, the HUD Settlement Statement issued in connection with the 2005 loan refinance transaction is in the record.  White June 17, 2016 Decl., Ex. 4; Yee Decl., Ex. 1.  It shows only one prior loan to be paid off in the amount of $166,640.35, suggesting that only the debt to United PanAm was disclosed in the application for the 2005 loan.

[5]  In the briefing and at oral argument, Plaintiff raised the argument that Craig did not state who actually told Paramount's representative this information about the loan from Duane and Margaret, or when.  At oral argument, Craig responded that he told Paramount.  While this was not offered under oath, I accept for the purposes of the motions that Craig told Paramount about the loan.

as beneficiary.

Finally, Defendants offer no contrary evidence or expert opinion contradicting Ehrig's assertions that:

(1) generally, it is customary as well as industry practice that lenders will not make residential loans unless repayment of the loan is secured by a first position security interest on the property;

(2)  typically, before making a residential loan, in order to ensure that they will be secured by a first position security interest on the subject property, banks and other financial institutions will rely on disclosures from the borrower(s) and will obtain and rely on a preliminary title report and a title insurance policy from a reputable title insurance company;

(3) Option One would not have made its $225,000 loan in 2005 to Craig and Linnell unless the repayment was going to be secured by first position security interest on the Property;

(4) Hyperion would not have made its $331,200 loan in 2007 to Craig and Linnell unless the repayment of the loan was going to be secured by a first position security interest on the Property;

(5) Option One exercised commercially reasonable diligence when it made the loan to Craig and Linnell because, pursuant to industry custom and practice, it obtained a preliminary title report and a title insurance policy from a reputable title insurance company before making the loan; the preliminary title report confirmed the recorded mortgage with United PanAm Mortgage; upon successful loan closing, the title insurance policy was issued, confirming vested interest for title in Craig and Linnell as well as the removal of United PanAm's mortgage position; neither the preliminary title report nor the title insurance policy disclosed the Mikkelsen

32 - OPINION & ORDER

Trust Deed and all reporting from the title insurance company concluded that following the

closing of the Option One loan, Option One held a first priority security position on the Property;

(6) Craig and Linnell's Loan Application for the 2007 loan did not disclose that the

Property was also encumbered by the Mikkelsen Trust Deed; if it had, Hyperion, based on

industry custom and practice, would have required that Duane and Margaret subordinate their

security interest in the Property to Hyperion to ensure that Hyperion would have a first priority

security interest in the Property; further, it was commercially reasonable for Hyperion to rely on

(a) the Loan Application signed and submitted by Craig and Linnell which disclosed only the

mortgage balance of $222,879 owing to Option One, and (b) the Occupancy and Financial Status

Affidavit acknowledging the responsibility of providing true and accurate information in the loan

application process, also signed and submitted by Craig and Linnell; and

(7)  Hyperion exercised commercially reasonable diligence when it made the loan to

Craig and Linnell because, pursuant to industry custom and practice, it obtained a preliminary

title report and a title insurance policy from a reputable title insurance company before making

the loan; the preliminary title report confirmed the recorded Option One mortgage; upon

successful loan closing, the title insurance policy was issued, confirming vested interest for title

in Craig and Linnell as well as the removal of Option One's mortgage position; neither the

preliminary title report nor the title insurance policy disclosed the Mikkelsen Trust Deed; all of

the reporting from the title insurance company concluded that following the closing of the

Hyperion loan, Hyperion held a first priority security position on the Property.

With these undisputed facts, Dimeo and SERA Architects, Inc. v. Klahowya Condos.,

LLC, 253 Or. App. 348, 290 P.3d 881 (2012), are distinguishable.  In Dimeo, there was no

dispute that the bank seeking equitable subrogation had knowledge of prior liens before the bank closed on the loan because they appeared in a preliminary title report.  164 Or. App. at 571, 993 P.2d at 185-86.  The bank argued, however, that at the time it released the loan funds, it was ignorant of the intervening liens because the bank had instructed the title company to ensure that the liens were either paid or subordinated and because, consistent with that instruction, the final title report made no mention of the liens.  Id. at 571-72, 993 P.2d at 186.  In the absence of controlling law, the court refused to conclude that reliance on a subsequent title report after notice of prior liens was either negligent or not negligent as a matter of law.  Id. at 572, 993 P.2d at 186.  Because the final title report itself made no reference to the disposition of the intervening loans which it had previously reported, the court could not conclude that the bank acted reasonably.  Id.  However, the court also refused to conclude as a matter of law that it was unreasonable for the bank to have relied on the report.  Id.  Notably, the record contained no information about what was commercially reasonable under the circumstances.  Id.

Unlike the bank in Dimeo, the preliminary title reports provided to Option One and Hyperion did not disclose the Mikkelsen Trust Deed.  Additionally, Ehrig's opinions provide the commercial reasonableness evidence lacking in Dimeo.  Thus, the facts in Dimeo make it inapplicable here.

In SERA Architects, the court held that the bank had actual notice of the facts that created an architect's lien and thus, had knowledge of the lien before the loan transaction.  The bank knew that the condominium developer had contracted with the plaintiff to perform architectural services for the project and that the plaintiff was in fact providing those services.  253 Or. App. at 365, 290 P.3d at 891.  The bank also knew of the construction timeline that indicated when site

preparation would begin.  Id.  The bank, the court explained, was ignorant of the law regarding

that the architect's lien first encumbered the property when work commenced, but the bank was

not ignorant of the facts giving rise to the lien.  Id.  ("this case is unlike any other in which

equitable subrogation was used to prevent manifest injustice. Shorebank's 'ignorance' in this case

was not induced by misrepresentations or negligence of others, but rather was due to its

misunderstanding of the law").  Thus, the court concluded, the bank had actual notice of the

architect's lien.  Id.

        Here, there is no evidence that Hyperion or Option One made any mistake about the law.

There is no reasonable dispute that neither Hyperion or Option One possessed knowledge of the

lien created by the Mikkelsen Trust Deed.  Thus, SERA Architects is also distinguishable.

        Finally, without knowledge of the Mikkelsen Trust Deed and having acted in a

commercially reasonable manner, Plaintiff establishes that is entitled to be equitably subrogated

to the first lien position of the original 1999 lender to the extent of the $166,640.35 payoff of that

1999 loan.  Consistent with this conclusion, Plaintiff is further entitled to summary judgment on

its declaratory judgment claim.

                                    CONCLUSION

        Defendants' motion for summary judgment [56] is denied.  Plaintiff's motion for summary

judgment [53] is granted.  Plaintiff is requested to clarify the status of the separately pleaded

unjust enrichment claim by either dismissing it in the judgment or notifying the Court that further

action on that claim is required.  If the latter, Plaintiff shall contact the Courtroom Deputy within

seven (7) days of this Opinion to so notify the Court.  Otherwise, Plaintiff is directed to prepare a

judgment consistent with this Opinion and tender it to the Court, after conferring with

Defendants, within fourteen (14) days of the date of this Opinion.  If the parties cannot reach

agreement, they may each submit proposed forms of judgment to the Court within fourteen (14)

days of the date of this Opinion.

IT IS SO ORDERED.

Dated this _____ 20 _____ day of _____ September _____, 2016

_____

Marco A. Hernandez

United States District Judge

36 - OPINION & ORDER